The final case for argument is the United States v. Rex Furman Manny Atwell and I represent Rex Lee Furman who is serving life imprisonment plus 10 years. The issues I briefed in my brief were threefold. First, the sufficiency of the evidence as it related to counts 1-13 which was production of child pornography, counts 14-15 which were distribution of child pornography. My next argument was related to a 1999 offense that was admitted into evidence under Rule 414. And finally, my third argument was that Furman began his conversation with law enforcement by saying the following, I've got some of that, referring to child pornography. I didn't distribute, referring to child pornography. Like I said, I didn't distribute. And he repeated that statement over and over again. As he was referred to during the trial of being a river of filth, a rapist, having sexual desires for children, he continued to defend himself by saying I did not produce that child pornography. The evidence at trial showed that there was 13 different production of and that date is important. The next set of pictures which was eight photographs were from September 3, 2012. And again, those dates are important. The government pointed out in their case in chief that Mr. Furman admitted that he produced child pornography. He admitted to taking pictures of his granddaughter and taking pictures of her vaginal area. And Mr. Furman, in fact, he's the one that even told law enforcement as they came into his house and were leaving his home after a search warrant was executed in February of 2013. And he said, excuse me, February of 2014, he said, by the way, there's going to be some disks. Make sure you look at those disks. There's going to be pictures of my granddaughter on there. When law enforcement went back and tried to look at those disks, they couldn't find any Mr. Furman. So they waited. And they waited until that following September and called him up and said, hey, you talked about those pictures that you produced. What are those pictures? Tell us about those. And he again started saying, number one, they were pictures I took of my granddaughter and I was applying medication along with my adult daughter. Next, he suggested they were photographs that were taken because he felt his grandson was molesting his granddaughter. And in fact, the evidence also indicated that there was some allegations the grandson was abusing his sister. All the times he told them about what was going on and these potential pictures. But at no time did law enforcement describe the pictures or show the pictures and say, counts 1 through 13, these production images, are these the images that you were talking about? At no time. And in fact, there was some controversy about whether or not those were the same pictures. When the agent described some of the photographs, Mr. Furman said, I don't know what you're talking about. There was no pictures of anybody's behind. Yet one of the exhibits through 1 through 13 showed the girls behind. He also said the pictures took place in the bedroom. Yet most of the pictures showed that the pictures took, the photographs were taken in the living room. So Mr. Furman defended himself saying, I don't know if these images in counts 1 through 13 are actually the ones that I am discussing that you may or may not think are child pornography. These may not be the same images. And in fact, he had the dates wrong also. So he defended himself saying he did not produce the images in counts 1 through 13. He next discussed his, the lack of evidence in regards to the distribution account. And the distribution account was basically using three different types of file sharing programs, LineWire, Ares, and then through a Nutella program. And he said, listen, I know that I had a file sharing program. What I would do is I would grab these images and as soon as I could, I would move them off into my desktop or move them off onto a CD or something else so I could not share those. And he asked the agents over and over again, I'm confused. How was it that you were able to even download 20 files such that you were able to get the search warrant to execute at my home? And they had to explain to him how the file sharing program worked. This was not a very sophisticated man. This was an individual who at the time of trial was age 53, had gotten his high school diploma but had very difficulties reading and had been diagnosed with some learning disabilities. He stated he knew how to download the LineWire program, but as the agent willingly admitted, a lot of times when it discusses how the file sharing program works, people just click through the screens and say agree, agree, agree. Similar to as I had stated in trial is if you download something, an update on your iPhone or your smartphone, you just click agree, agree, agree. And Mr. Fuhrman had told officers during his interrogations he did not understand how the distribution worked. He did not understand how file sharing worked. All he knew is once he downloaded everything, he had to move it quickly. And he was confused as to even how officers were able to download only the 20 files. So respectfully, Your Honors, I would argue that there wasn't enough evidence to show that he knowingly, knowingly distributed child pornography. The next argument I have relates to the 1999 conviction. And in the 1999 conviction, what the government, I objected at pretrial and again objected right before the evidence was submitted to the court, or it was admitted into evidence. The conviction relates to a 1990 conviction in which Mr. Fuhrman at trial was convicted of first degree sexual assault. The evidence that came in was that it occurred in 1999 that the victim was his daughter at the time, that the victim, his daughter, was age 10 years old, and that the acts were that he inserted his finger in her vagina and forced oral sex. Under 414 is what the court agreed that the government could bring in this evidence. And I argued under 403 that this was far too late. If the jury heard how close in time this was to the now current allegations, it would certainly taint them. And taint them it did. It was shocking information as the description was died, not only of the conviction, but the actual acts and the relationship between Mr. Fuhrman, his daughter, and now the newest victims the government was alleging were his granddaughters. The mother was the victim from his 1999 case. That information alone was very prejudicial and should not have been allowed in under 403. Finally, Your Honors, my argument as to the Eighth Amendment, and I rest on my brief in that, in that I'm arguing that the life plus the 10 years for a man this age, and to kind of look at it categorically as the whole being able to impose a life sentence under 3559E does go against cruel and unusual punishment. With that, Your Honors, unless there's any questions, I will rest. Mr. Cheever, good morning. Good morning, Your Honor. Judges Grunder and Arnold as well. I'm Mike Cheever. May it please the court. I did not handle this case at trial. One of the two people who did is in the courtroom, Melinda Williams. The other attorney was a DOJ lawyer, Alexander Gelber. I want to say, cover two things. One is a factual matter that sort of just broadly covers Rule 414, and then I want to note a couple citations for the distribution count. Before I say that, I think it merits at least a short statement of what we have here. Mr. Furman was a serial rapist of prepubescent female family members, and the life sentence plus 10 years was entirely appropriate in this case. The defense does not dispute the appropriateness of that sentence in this case, unless she did just at this argument, but makes a categorical argument. I'll rest on my brief with respect to that. The fact that I want to bring out or the factual pattern I want to bring out is that it's noteworthy in this case that after the first conviction, it took a long time to catch this person a second and third time. He assaulted his five-year-old stepsister when he was 19. When he was, I guess, ages 20 to maybe 29 to 35, he was sexually assaulting his daughter throughout that time, and it wasn't until her seven-year-old younger brother started molesting her as well that she came forward and he was prosecuted and did to a large extent. The defendant was molesting his two granddaughters, a five-year-old and a four-year-old, for about six months, and they didn't come forward until their seven-year-old sixth and then turned seven-year-old brother was imitating their grandfather and molesting them. And Rule 414 in part gets at that. It's children who are facing people who are adults, grandparents, and family members often. And that standard, there's some trepidation. Judges, prosecutors, this Court handles 414 with kid gloves to some extent, but the Court also recognizes it's real and should be applied. It was a political decision of Congress to make. Such as this would be the perfect example, is appropriate. The Rule 414 issue isn't a close one in this case, but I think this case illustrates its appropriateness for the general purpose that it was made, and the District Court handled that correctly. The thing I want to say about the distribution counts is really a deficiency in my brief. I didn't bother to cite to any of the cases, many cases this Court has decided in terms of distribution and the fact-finding. Most of those are under Guidelines sections, but there are two that are right on point with this case. Sufficiency of the evidence. The Court recognizes that evidence showing that a defendant installed and used file-sharing programs is good evidence of distribution. The two cases are United States v. Collins, 642, F-3rd, 654, 2011, and United States v. Hill, 750, F-3rd, 982, 2014. It's sort of on this point, it's a tiny correction, but Ms. Atwell referred a couple times to the Lime Wire Program. That is a different peer-to-peer file-sharing program. The one Mr. Furman was using in this case from September to January or February of 2014 was called Lime Share, and it's sort of obvious if you're using file-sharing programs that you are sharing programs. You have it in a folder called Shared, but it wasn't Lime Wire, it was actually Lime Share because it's a file-sharing program unless you have other... What about this idea that if, that he thought if he moved them out immediately then they wouldn't be shared anymore? Well that was certainly a factor for the jury to consider, but in making that statement it showed his knowledge that if he doesn't move them out of there, they're going to be shared. And law enforcement was able to download 20 of those files, the first in August of 2013, and then from September through, or maybe it was October, but through January 30th of 2014, was able to download many other times. And the evidence showed basically whenever the law enforcement, the agent officer, Hanson or Agent Jaguar, affirmatively looked at his shared folder, there was child pornography in it. And then Exhibit 172 is somewhat different. It's an automatic software that goes out looking for child pornography, and every time it visited his website there was child pornography on it, ranging from four files to 136. So his defense is just, the jury was free to reject it. It was just false. What was the state of the evidence with respect to, if there was any, with respect to, for instance, when a particular file was available on FileShare and the government in fact intercepted it, the gap? There were... Any evidence on how long it was up? The evidence as to count 15, we don't have much evidence of duration. There was automatic law enforcement software that's searching in Minnesota for shared file folders that have 11 or more items of known child pornography. And it found 22, that automatic software found 22 on Mr. Furman's computer, a different computer at that time. And the officer was able to download two and a half child pornography videos. And the law enforcement software does that more slowly than ordinary FileShare programs. The FileSharing allows a computer to download... For a very short period of time. It could have been, but it was long enough for somebody else to download it, and that's all it takes. Well, especially if you're searching for it, some kind of computer has the capacity to cast a wide net. Yeah, but I don't think that matters. If he had... What we saw, the jury saw his practice thereafter, which was to keep it in there, something in there all the time. And as to a particular file, he doesn't have to intend, per se, a particular file. If he's leaving files in there of child pornography, he knows he's going to distribute it, and whenever someone downloads it, they have it. Do you suggest that the file was, in fact, shared by anybody other than the government? No, of course not. I mean, the government did not then share it other than at trial. From his computers. Anyone shared his files other than the government. No. And the analogy I would use, Your Honor, in... The thing I would caution the court against, and I know you handle file-sharing cases fairly often, this is the first one for me, but it was helpful for me to remember that just because it's software, just because it's invisible to the naked eye, doesn't mean it's not out there for the public to grab. And the analogy I use is the little libraries that you see around in people's yards. They have a box on a post in the front yard, and they put books in there, and you can come in, you can take the books out and share them. I understand, but if somebody was actually taking a book out, there would be more evidence that he intended for them to do that, but what you're saying is... I think it's exactly the same. I mean, I think it's even more so. I mean, I put the book out on my front yard in one of those boxes. Someone has to walk by. Someone in China or someone in New Jersey can't come and take that book. When you put it in your shared file folder in file sharing program, it's far more available, far more likely to be distributed than if you put it in your front yard and put it in one of those boxes. I don't think I suggested that. What I suggested was there was no evidence that anyone actually shared, he shared it with anybody. That is to say, nobody intercepted it. Well, the cases are really strong for the government that a download by the government counts as distribution. There's a case out of the Third Circuit, Hussman, H-U-S-M-A-N-N, and I can get you the site, but that court held, and it hasn't been favorably received, that there was no evidence that anybody ever downloaded. And that was, they found that was insufficient for distribution. It's a bad decision. It's really been passed over by the Tenth Circuit in a case called Shaper, S-H-A-F-F-E-R, that this case, this court has cited, including in that Collins case that I gave to you. It was a Tenth Circuit case by our now Justice of the Supreme Court, but that case and a First Circuit case called Richardson and a Fifth Circuit case of a name that I'm familiar, but it's in those line of sites, all say that this is sufficient. You can take that evidence that a person understands file sharing software, and if somebody downloads it, even the government, even if it's there, you know, it just, it's a jury question as to whether it's there long enough. Yes, sorry, Your Honor. If it's in a file that someone else can access, that's sufficient evidence of distribution by making it available for distribution. That's the government's position. Well, doesn't it have to be knowingly? Yes, and there is plenty of knowledge shown in this case, and the Collins and Hill cases support that. He knew that that was what would happen or could happen if he didn't remove that file or if he didn't remove it. Because if he had successfully removed those things, the most he could have been charged with was what? Possession, which is a much lesser... And receipt. I mean, it's very significant in this case that he was convicted of receipt and doesn't challenge that. It's the same sentence. It's 40 years. He was sentenced to 40 years on count 16, and so these distribution counts, it's, you know, it's significant. Receipt? Receipt. Yeah, it's the same statute. For a 40-year sentence? Yes. How do you receive something without possessing it, or how do you possess it without receiving it? Is there a stand-alone possession charge that's possible? There is. That's count 17, and there were, I think, 19 different files of child pornography that he... How do you possess it without receiving it? Well, I don't know, but receipt requires some interstate transportation. All right. I guess we should concern ourselves... It's hypothetical, but in this case, he admitted, he fully admitted he went out looking for this stuff because he liked it. Of course he did, but that's... My question was, how do you... I don't understand how you can possess something without receiving it. That's not an issue in this case, and I don't understand how it relates to the... You said there was a difference between possession and receipt. There is. It was the same, essentially, in terms of penalty as production. Yeah, for distribution. Distribution. Exactly the same. Why isn't possession always receipt? Because there's no interstate transportation, or it may have been produced using it. I don't know the facts, but receipt, it gives the government, if nothing else, an option of charging a lesser crime for people that it doesn't deem need the higher penalties. Congress saw fit to make those two separate statutes. I think it was a good idea, but receipt carries a very serious penalty because it's a very serious crime, just as possession is. But it's a lot less serious penalty for possession. Yes, certainly. On the distribution count, as I understand the argument, the defendant admitted taking some pictures of the granddaughter, but not the ones that were subject of the distribution counts. You're talking about the production counts, and that is... You're correct. Sorry. Yeah, I meant... You're correct. So what was the evidence that he actually produced the ones that were charged? It's helpful that he admits taking such pictures, but he was very accurate in his description of the videotape that was count 13 and the still shots that were counts 9 through 12. He described taking pictures of his granddaughter's, he said both of them, vagina on the evening or the night after a birthday party, and on his camera in his house in his bedroom was the camera that took those photos, and the discs were in his bedroom, and the photos were exactly as he described. There were pictures from the birthday party. Exhibit 30 is in the government's appendix, so you can look at that one. And then it goes to a video, which he says he took, but he mistakenly hit the wrong button. And the video looks like that. It's a three to four second video, as he described, that just looks like you didn't intend to take a video. You intended to take a photo. And then he takes four more photos of the vagina. Nine through 12 were those counts. And he said that they were dark. They didn't turn out well. And when he's told what they looked like by Officer Jaguer, I believe it was, over the phone on September 29th, the officer says, these are kind of dark. And his response is, those didn't turn out very well. And so he knows exactly what photos we're talking about. He described them as being on two discs, and as the officers were taking them out of his house, he said, you've got them right there. You've got both discs. So the evidence of production is pretty overwhelming. I think it's, I mean, I don't know how much more you can get than an admission that that is that good. Those were the photos. And even if he hadn't admitted it, the circumstances show that he was the one who produced them, because they were on his camera with other photos he took. I'm out of time. I just realized that. Sorry. Was that wrong? Very briefly, Your Honors, in regards to the production count, it is true that Mr. Famin did describe one of the images, which was a video, that he said he was taking a picture, but then he realized the video was on. And that was one of the counts, and one through counts 13. That similar type of situation where it looks like the video was supposed to be a picture taken, but it looks like the video was running. But regardless, we still don't know if that's the exact same one that he was discussing, because there was plenty of other discrepancies. For example, he says all the pictures were taken, including that video, in the bedroom, yet it was very clear from the images from counts 1 through 13, there were images actually in the living room. And when the agent was describing some of the images on trial transcript page number 385, the BCA agent described some of these images, and Mr. Famin's response during the interrogation is, I don't know which images you're talking about. I don't know what these are. So I would continue with my argument that the images in 1 through 13 were not the same ones that he was discussing with agents at the same time. But there's no doubt they came off of his camera that was found in his bedroom, right? The camera that was found in his house, yes. And I apologize, Your Honor, I'm not sure if it was in his bedroom or somewhere in the house. There was evidence of discs and images in the bedroom and I think one other area, but it could very well be that the camera was in the bedroom. And he did not argue that that wasn't his camera or anything like that. That was not one of the arguments or defenses we placed. So that combined with him admitting to taking similar photos, you don't think that's sufficient evidence of production? No, because the government was very precise. Count one, it's this image. Count two, it's this image. Count three, it's this image. And so it should be that if that's what they're saying, he produced that particular image, it should be evidence that he did, in fact, take those. But there was plenty of evidence to suggest otherwise. In regards to the distribution, I do stand corrected. Mr. Cheever's right. I keep saying limewire. It is limeshare, and I apologize for misspeaking. One of the arguments the government just raised is that if he understands the file sharing program, that's enough to knowingly distribute. But, again, Mr. Ferman was adamant about saying he does not know how file sharing works, and he asked the agent, because he kept saying, I know if I remove it really quickly, there's no way I can share. Tell me how you were able to get those images, because he had always thought all along, like if he downloaded these images, he moves them, that should be enough. And he didn't recall ever having to left things on there for a long time or a minute or two minutes. During the questioning of Officer Hanson, he testified that you could be downloading something, and at the same time, somebody can then start. While you're downloading, you can also be simultaneously sharing at the same time. We don't know if that was the case here or not, but I would suggest that because he didn't knowingly, knowingly distribute to the agents, and there was no indication that he distributed to anybody else, and Agent Hanson was questioned about that, if they looked to see if he had shared with anybody else, and they did not look to see if he had shared with anybody else. Respectfully, Your Honors, I would submit, again, that there was insufficient evidence to convict him of counts 1 through 13, the production. I was going to ask a follow-up question. Why was the evidence insufficient as to the 1 through 13? Again, because there was no evidence that he's actually the one that took those images. When he was interrogated by the police, he talked about certain images he took, but they didn't match up with the images they had as exhibits in counts 1 through 13. Thank you, Your Honors. Just for clarification, you didn't make the argument, did you, that distribution to the government is insufficient? No, Your Honor. My argument was that he didn't knowingly distribute. Thank you. Thank you. The case is submitted, and we will take it under consideration.